## Kittie A. Shaw, Administratrix, Appellee, v. Illinois Steel Company, Appellant.

### Gen. No. 5201.

1. MASTER AND SERVANT—*when moving cause of injury need not be shown.* If the preponderance of the evidence supports the finding of the court that a brick fell from the charging floor (dynamite being used) by reason of the negligence of the servant or servants of the máster, not fellow-servants of the servant injured, it is not essential to a right of recovery that the servant or his personal representative should show the cause or force which put such brick in motion.

2. PLEADING—*effect of verdict upon defective declaration.* If the declaration states a cause of action though defectively in some particulars and its sufficiency was not questioned by demurrer, the defects are cured by verdict.

3. VERDICTS—*when not excessive.* A verdict of $5,000 rendered in an action for death caused by wrongful act is not excessive where it appears that the deceased at the time of his death was a strong healthy man of more than ordinary intelligence and earning capacity, working steadily, living with and supporting his wife and five minor children, all of whom he left surviving.

Action in case for death caused by alleged wrongful act. Appeal from the Circuit Court of Will county; the Hon. DORRANCE DIBELL, Judge, presiding. Heard in this court at the April term, 1909. Affirmed. Opinion filed March 11, 1910. Rehearing denied April 13, 1910. *Certiorari* denied by Supreme Court (making opinion final).

GARNSEY & WOOD and WILLIAM BEYE, for appellant; KNAPP & CAMPBELL, of counsel.

DONAHOE, McNAUGHTON & McKEOWN, for appellee.

MR. JUSTICE WILLIS delivered the opinion of the court.

This was an action on the case brought by Kittie A. Shaw, administratrix of the estate of Alexander Shaw, deceased, against the Illinois Steel Company to recover damages for the loss of support by the next of kin of deceased, who died from injuries sustained while removing scrap or salamander from the inside of

one of the company's cupolas in its plant at South Chicago.

The declaration contained five counts. The first count averred that the company negligently permitted a large brick to remain loose in the wall of the cupola, which fell upon the head of deceased. The second count averred that the company negligently permitted a large number of bricks of great weight at and near said cupola above where the deceased was at work and that a brick fell into said cupola on the head of the deceased. The third count averred that the company negligently caused a large brick to be thrown into the cupola; and that the brick struck the deceased. The fourth count averred that the company negligently permitted a large brick to fall into the cupola and that it struck the deceased. The fifth count charged general negligence in the conduct and management of said cupolas; that as a consequence a large brick fell upon the head of the deceased. Each count alleged that appellee's death resulted from the negligence charged therein, that he was then in the exercise of due care, and that the deceased left a widow, children and grandchildren as his next of kin and only heirs at law and that by reason of his death they suffered pecuniary loss. A plea of not guilty was filed, a jury was waived and the cause was submitted to the court on the evidence taken on a former trial. The court found the company guilty and entered judgment for the administrator for $5,000. Later, a *nunc pro tunc* order was made granting the company leave to enter a motion in arrest of judgment, which was made and overruled. Judgment was entered on the finding and the company prosecutes this appeal.

It appears that the company, on and before September 30, 1905, was engaged in the manufacture of iron and steel products at Joliet and South Chicago, Illinois. In the South Chicago plant there were three cupolas which were furnace-like structures eight or nine feet in diameter used in the reduction of pig iron

combined with coke, stone and brick. They were placed in line five feet apart, lengthwise of a building forty or fifty feet long, north and south, and twenty or twenty-five feet wide. The building had two metallic floors, the first ten feet from the ground, called the melting or tapping floor, which was practically level with the bottom of the cupolas; the other was about fifteen feet above the tapping floor and was called the charging floor. The roof was about ten feet above this floor. About six feet above the charging floor, the cupola wall tapered into the stack which projected out of the roof. The cupolas were steel lined with wedge-shaped fire brick, of two sizes slightly rounded on the inside. The larger ones, which were about nine inches long and nine inches wide at one end and seven at the other and four and one-half inches thick, were used up to a point where the wall began to taper, and from there those of the same size, except that they were two and one-half inches thick, were used. Under each cupola were four columns about ten feet in length set in the ground. In the bottom of the cupolas were circular holes, which, when the cupolas were in operation, were filled with plates held in place by supports which ran to the ground. On the charging floor there were four openings into each cupola about four feet square called charging doors, through which the material to be reduced was placed. At the bottom of each opening was an iron sill rising from three to four inches from the floor, against which the steel buggies containing material to be reduced were run when they were dumped. The cupolas were numbered one, two and three, beginning at the north. The north cupola was about eight feet from the south side of a stairway in the northwest corner of the building, and the south cupola was about eight feet from the north side of the elevator shaft, which was in the middle of the south end of the building. The distance from the cupolas to the side walls of the building was ten feet. The process sometimes created a frozen material called scrap

or salamander, which adhered to the bottom and sides of the cupola and which had to be removed. At the South Chicago plant this was done by dropping a ball weighing about three tons from the stack upon the salamander. A heavy timber was placed across the stack through two holes in the sides about two feet above the dome and a block and tackle attached thereto, and by means of this the ball was raised. At the Joliet plant, the scrap and salamander were removed by exploding small charges of dynamite, and for some time prior to the accident deceased had done this work there, and he and one Andrew Partillo, his helper, were sent to the South Chicago plant to do the same work. They removed the salamander from cupola number one and began on number two about four o'clock P. M. September 29, 1905. At that time masons were engaged in putting a new lining in cupola number one. At first the brick and mortar were handed the masons through the opening in the cupola on the tapping floor, which had been made by removing a plate. After a time it became inconvenient to pass the material through the hole at the tapping floor and it was taken on the elevator to the charging floor and wheeled past cupolas numbers three and two to the north cupola, number one, and lowered to the masons through the charging door. The deceased and his helper loosened the salamander in clearing the cupola, and it was removed by men supplied by the company. Shortly after noon on September 30, 1905, the deceased had removed all the salamander from number two except some scrap which adhered to the wall about eight feet up from the bottom and which was about three feet wide. The deceased placed one end of an eight-foot ladder on the bottom rim of the cupola opposite the scrap and rested the other end about three inches above the top of the scrap, and was standing with one foot on the ladder and the other on the top of the scrap, preparing a charge of dynamite. The warning cry of "Fire" had already been given when a brick

fell and struck him on the head, causing him to fall off the ladder, through the opening in the bottom of the cupola, and down the chute upon the dump twenty feet below. His death resulted a few minutes thereafter from the injuries which he thereby sustained.

Appellant contends that the evidence shows that the brick that caused the death of Shaw fell from the stack and that it was dislodged by the last shot fired previous to the accident; and that his death was the result of an assumed risk. Appellee contends that his death was caused by a blow from a brick which fell into the cupola from the charging floor through the negligence of servants of appellant, not fellow servants with deceased.

For appellee, Shaw's helper, Andrew Partillo, testified that he saw the brick fall and hit Shaw on the head; thought the brick was one of the heavy ones for lining the cupola; that the brick broke in two, one piece falling near him; that he looked for the brick on the dump, but there were so many that he could not find it; that there were bricks on the charging floor in the forenoon; that after every shot he and deceased examined the walls of the cupola and then went in and cleaned out; that they looked for loose bricks in the cupola after the last shot was fired, but did not see any; and that Shaw always looked up and around, "watching better than I did." Appellant's superintendent testified that he looked over the cupola after Shaw was killed, and that "you couldn't see any place where any brick had fallen out of."

Andrew Vodachik, a mason's helper on the charging floor working at cupola number one, testified that he was looking through the charging door of number two and saw a brick fall from above and hit Shaw. On direct-examination he was asked the following questions and made the following answers:

"Q. Did you see what struck Mr. Shaw? A. Yes, sir, I see.

Q. What was it? A. A brick fell down from above.

Q. Do you know where the brick fell from? A. The brick fell from above the timber; where the timber was placed.

Q. Did you look to see where it fell from? A. Yes, sir; I looked; I seen.

Q. Did this brick fall from the stack? A. Yes, sir.

Q. Were there any bricks between where this brick came from and the timber? A. Between the timber there was no bricks, but I seen the space from where the brick fell.

Q. Between the place where the brick fell from and the timber, were there any bricks? A. There couldn't be any bricks because that brick fell out.

Q. When you first saw the brick how far was it from Mr. Shaw? A. When I first saw the brick it must have been about from twelve to thirteen feet.''

In his cross-examination the following appears:

''Q. You saw the brick that struck Mr. Shaw fall all the way down, did you? A. Yes, I seen it.

Q. You saw it when it started and you saw it when it struck him? A. When it hit him I seen it.

Q. Didn't you say you saw it all the way down? A. When it was falling I seen it. Seen it from the place.

Q. Did you see it from above? A. Yes.

Q. How tall are you? A. A little more than six.

Q. About two feet above your head you first saw this brick? A. Yes.

Q. Did you see the brick when it came out from the hole up above? A. Yes.

Q. You saw it coming out of the chimney stack? A. I didn't see it when it was falling out of there. I seen it when it was flying down.''

We attach but little weight to Vodachik's testimony because of its uncertainty and seeming improbability. We cannot conceive of a man a little over six feet in height stooping so as to be able to see through an opening in a thick wall, which opening came only four feet above the floor on which he stood, and be able to see a brick fall from the smoke stack above him and follow it with his eye until it struck Shaw, and that too

when he was not working on this cupola and had no occasion to notice what was going on there but was engaged in an entirely different work at cupola number one. On redirect-examination he testified that he was looking in at the charging door to see if they had set the shot so he could get away. The evidence shows that at the time the brick fell, the warning had been given that a shot was to be fired, and it does not seem probable to us that he, having no business at the place, would have run the risk of remaining after that.

It was undisputed that Shaw was experienced in the use of dynamite, and there was proof that he was careful always to inspect the cupolas after a shot had been fired before he allowed his men to enter, and to look for and take down loose material; that he inspected the inside of this cupola after firing the last shot; that the last shot was fired about half an hour before the accident; and that he was placing another charge at the time of the accident. There was also proof that upon an examination of the inside of the cupola after the accident, appellant's superintendent could find no place from which a brick had fallen; that Partillo looked after the accident and found no such place. The only proof that the brick came from the wall of the cupola is the testimony of Vodachik which, in our opinion, is unworthy of credence. If the brick did come from the inside of the cupola it must have fallen from the charging floor as the result of the negligence of servants of appellant, not fellow-servants with deceased. There was proof that bricks were being wheeled on the charging floor from the elevator to cupola number one past number two and piled near cupola number one, and let down and handed to the masons relining number one; also that men were charging number three. While there was no direct proof that a brick fell into the cupola from the charging floor, the possibility of its having come from the inside of the cupola was practically eliminated by proof of the fact that, upon an examination made by

appellant's superintendent and another of its servants, no place was found after the accident from which a brick had fallen. From a careful reading of all the evidence in the case, we cannot agree with counsel for appellant that the trial court misunderstood certain of the material evidence, but on the contrary, we are of the opinion that a preponderance of the evidence supports the finding of the court that the brick fell from the charging floor by reason of the negligence of a servant or servants of appellant, not fellow-servants of deceased, and it was not indispensable to the right of recovery that appellee should have shown the cause or force which put the brick in motion. Armour v. Golkowska, 202 Ill. 144.

It is urged by appellant that the declaration does not state a cause of action in that no count charges any duty on the part of appellant to warn the deceased; and that it does not charge that appellant had knowledge of the conditions and that the deceased lacked such knowledge, and that it does not state any facts from which a duty on the part of appellant can be inferred. Appellee contends that no count of the declaration is based on a neglect of duty on the part of appellant to warn and instruct deceased, but that the negligence complained of is in failing to exercise ordinary care to provide a reasonably safe place in which to work, and argues that the words "suffered and permitted" used in the declaration, express the idea of implied knowledge, citing Illinois Steel Co. v. Ostrowski, 194 Ill. 376, in which it was held that the averments that the defendant "allowed" the machinery in question to become old and worn out, and that it neglected to have proper inspection of it, were sufficient as showing the defects in the machinery and the knowledge of defendant of them. In our opinion the declaration states a cause of action, perhaps defectively in some particulars, but as its sufficiency was not questioned by demurrer, any defects were cured by verdict. City of East Dubuque v. Burhyte, 173 Ill.

SECOND DISTRICT—MARCH, 1910.    399

553. There was, therefore, no error in overruling the motion in arrest of judgment.

It is claimed that the damages are excessive. The deceased was a strong, healthy man of more than ordinary intelligence and earning capacity, working steadily, living with and supporting his wife, appellee, and five minor children, all of whom he left surviving. As the damages allowed only equal fifty per cent of the amount authorized to be recovered under the law, we do not consider them excessive.

Finding no reversible error in the record, the judgment must be affirmed.

*Affirmed.*

MR. PRESIDING JUSTICE DIBELL took no part in the decision of this case.